UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE OSHANA and ) | |
| GTO INVESTMENTS, INC. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 11 C 4135 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| BUCHANAN ENERGY and ) | |
| EXXONMOBIL OIL CORPORATION, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs George Oshana and GTO Investments, Inc. ("GTO") move to file their First Amended Complaint. Defendants Buchanan Energy ("Buchanan") and ExxonMobil Corporation ("Mobil") oppose the plaintiffs' motion to amend and concurrently move to dismiss the plaintiffs' proposed amended complaint. For the reasons stated below, the court grants the plaintiffs' motion in part and grants them leave to file an amended complaint consistent with this opinion. Additionally, the defendants' motion to dismiss is granted in part and denied in part.

**I. B**ACKGROUND

The plaintiffs operated a Mobil-branded gasoline station in Itasca, Illinois pursuant to a lease agreement entered into with Mobil in 2006 (the "Lease"), which was later assigned to Buchanan in 2010. Oshana was the guarantor on the Lease, which was formally in GTO's name. The plaintiffs allege that the rent to be charged in the Lease was to be set in accordance with Mobil's National Rent Guidelines (the "Rent Guidelines"). The plaintiffs, however, allege that they were not charged rent consistently

with those Guidelines. They also allege that the defendants have wrongfully withheld the plaintiffs' credit card receipts in violation of the Lease, and that the plaintiffs' franchise was eventually terminated by Buchanan for invalid and pretextual reasons. Accordingly, the proposed amended complaint alleges that the defendants violated the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. § 2801. Other counts allege that the defendants committed various state law violations including breaches of contract and conversion, and that their actions were justified by the doctrine of equitable recoupment.

This case was originally filed in the Circuit Court of DuPage County on May 10, 2011, but was removed to this court based on diversity. On June 23, 2011, the defendants filed a motion to dismiss, after which the plaintiffs filed their current motion to amend their complaint on December 6, 2011. After the defendants filed a second motion to dismiss on December 21, 2011, the court consolidated the motions to amend and to dismiss into a single briefing schedule. For this reason, the court considers the motions concurrently.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 15 governs motions to amend complaints. Complaints may be amended once as of right if the motion to amend is filed within twenty-one days of the filing of a motion to dismiss. *See* Fed. R. Civ. P. 15(a)(1)(B). In other cases, "a party may amend its pleading . . . with . . . the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts interpret this standard to allow amendment "when there is a potentially curable problem with the complaint or other pleading." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). Nonetheless, "it is well settled that a district court may refuse leave to amend

2

where amendment would be futile." *Id.* at *12 (citing *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008)). And claims raised in a proposed amendment "[are] futile if [they] would not withstand a motion to dismiss." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001).

When reviewing a motion to dismiss, the court notes that, under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Documents attached to the pleadings may be considered when reviewing a motion to dismiss "if [those documents] are referred to in the plaintiff's complaint and are central to [the plaintiffs'] claim[s]." *Wright v. Associated Ins. Co. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The pleadings must "provide the defendant with fair notice of the claim and its basis." *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). However, pleadings that are mere conclusory statements of legal principles or elements of causes of action are not entitled to the presumption of truth. *Iqbal*, 129 S.Ct. at 1949-50.

### III. ANALYSIS

Because this court must assess the plaintiffs' proposed amended complaint for futility, and the futility analysis blends with the analysis governing a motion to dismiss, the court analyzes each of the relevant counts of the complaint as if this were a motion to dismiss under Rule 12(b)(6).

**A. Plaintiffs' Breach of Contract Claims (Counts I & VI)**

1. Count I

Count I alleges that the defendants have not properly set GTO's rent. It alleges that "Mobil and its successor in interest Buchanan are obligated to set the rent for the Location in accordance with the Rent Guidelines," (Prop. Am. Compl. ¶ 21), but that they "breached the Lease by failing to set the rent in accordance with the Rent Guidelines and collect[ed] more rent than was due according to the lease." (*Id.* ¶ 23.) The court, following the rule in the Seventh Circuit, incorporates both the Lease and the Rent Guidelines into the pleadings, as well as the other documents that are referenced in the plaintiffs' complaint and are central to their claims. *See Wright*, 29 F.3d at 1248.

According to the Rent Guidelines, the rent Mobil charges its franchisees "is determined by multiplying the total property value by 12% and adding the real property tax charge." (*See* Rent Guidelines at 1, ECF No. 1-1.) The total property value is "established by a third party appraiser selected by ExxonMobil." (*Id.*) Mobil's rent proposal that would govern GTO's rent from 2011-2014 was dated August 13, 2010 and was attached to plaintiffs' complaint as Exhibit 2. It appraised the plaintiffs' land at $706,000 and stipulated monthly rent charges at or around $12,000 from 2011-2014.[1] GTO refused to sign this proposal.

As Exhibit 4 to their complaint, however, the plaintiffs attach an appraisal (the "Carbone Appraisal") that they—not Mobil—solicited, indicating that the appraised value of the property is $400,000, which the plaintiffs allege implies that their monthly rent should be $4,000 ((12% of $400,000)/12 months). (*See* Prop. Am. Compl. ¶ 16.)

---

[1] The plaintiffs, meanwhile, allege that a more recent rent proposal from Buchanan "demand[ed] that the rent be set in excess of 7,500 [per month]." (*Id.* ¶ 19.). GTO has also refused to sign this proposal.

4

This appraisal was dated October 20, 2010. Further, they allege that the transfer price of the property was only $300,000 when Mobil transferred the property to Buchanan, which would imply a monthly rent of $3,000. Standing alone, however, these allegations are problematic for the plaintiffs because the Rent Guidelines, as noted above, provide that the rent determination is made using *Mobil's* third party appraiser. The plaintiffs, by referencing Exhibit 2, admit that Mobil's appraiser estimated the land value at $706,000, which would justify the proposed rent charges outlined by Mobil under the Rent Guidelines.[2]

Nonetheless, the Rent Guidelines allow a lessee dealer to challenge Mobil's rent appraisal by "provid[ing] written notice to its territory manager within 10 days of receipt of [an] appraisal summary from Mobil's appraiser." Such a challenge was made by GTO in 2010, and the plaintiffs allege that they "disputed the increased rent in accordance with the dispute procedures outlined by Mobil." (*Id.* ¶ 14.)[3] These procedures would have required the plaintiffs to obtain their own third-party appraisal, which would then be averaged with the defendants' original appraisal and a second third-party appraisal secured by the defendants. The Carbone Appraisal, as incorporated into the pleadings, indicates that the plaintiffs obtained such an appraisal pursuant to the Rent Guidelines' contemplated rent-challenge procedures.[4] However, the plaintiffs also attach as Exhibit 6

---

[2] Nothing in the contracts indicate that the transfer value of the property can be used as a substitute for Mobil's third-party appraisal.

[3] The fact that a challenge was properly made was verified by Buchanan's letter of March 18, 2011, which indicates that a rent reduction request was made by GTO "pursuant to the rent policy under the PMPA Franchise Agreement." (*See* Ex. 6 to Compl.).

[4] The Carbone Appraisal lists two dates, October 20, 2010 and November 2, 2010. These dates suggest that the proposal was requested by GTO shortly after it received the appraisal notice from Mobil on August 13, 2010. This, in addition to Buchanan's March 18, 2011 letter, further suggests that GTO challenged the rent proposal for 2011-2014 in a timely fashion under the Rent Guidelines.

to their complaint a letter from Buchanan dated March 18, 2011. This letter specifically responds to the plaintiffs' rent reduction requests, notes that Mobil obtained a third appraisal in the amount of $1,040,000, and averages that proposal with the two other appraisals using the averaging procedure contemplated in the Rent Guidelines. The average appraisal was $715,000, which was more than Mobil's original appraisal in the amount of $706,000. As a result, Buchanan determined that the plaintiffs' rent should have been increased even more. None of the plaintiffs' other allegations dispute the contents of Buchanan's March 18, 2011 letter.

All of the plaintiffs' documents, when considered alongside the allegations in the complaint, seem to indicate that the defendants followed the rent-setting procedures set forth in the Rent Guidelines. Thus, they appear to refute the plaintiffs' claim that the defendants "fail[ed] to set the rent in accordance with the Rent Guidelines and collect[ed] more rent than was due according to the Lease." (*Id.* ¶ 23.) When a plaintiff "plead[s] facts that show he has no legal claim," a plaintiff "can plead himself out of court." *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011). Nonetheless, a claim must merely be *plausible* to survive a motion to dismiss, and at this point the court is assessing the complaint for futility. The complaint alleges that (1) GTO obtained its own appraisal of the gas station that was only $400,000 (*id.* ¶ 15); (2) Buchanan only paid $300,000 for the gas station (*id.* ¶ 18); and (3) the defendants have not made capital investments in the property (*Id.* ¶ 11.). These allegations, when taken as a whole, adequately supporto an inference that the defendants may have breached their obligation properly to appraise the property in accordance with the Rent Guidelines. For example, the two appraisals obtained by the defendants that were used to set the rent may not have complied with the

6

Rent Guidelines' requirement that "[t]he value of the land component of the appraisal will be determined using the sales-comparison method and will be based on the highest and best use of the land, regardless of current use or the nature of the underlying estate." (National Rent Guidelines at 1.) If they did not, a breach could be plausible. Accordingly, the proposed amended complaint is not clearly futile on this count.[5] Remaining issues regarding this claim should be addressed on summary judgment and/or trial.[6]

2. Count VI

Under the Lease, the plaintiffs were also obligated to purchase gasoline from the defendants. (Lease § 2.1.) Count VI, the plaintiffs' second breach of contract claim, alleges that "[p]ursuant to Plaintiffs' PMPA fuel supply agreement and Lease, Buchanan is obligated to sell [gasoline] to the Plaintiffs at prices set by Buchanan in good faith." (Proposed Am. Compl. ¶ 51.) Specifically, the Lease states that the "Franchise Dealer shall pay ExxonMobil *the price that is in effect* at the time of loading of the delivery vehicle." (Lease § 2.2 (emphasis added).) Although the "price that is in effect" is not specifically defined in the Lease, the plaintiffs allege that this pricing refers to an "open price term," which "is referred to in the industry as the 'dealer tank wagon' price or 'DTW.'" (Proposed Am. Compl. ¶ 52.) According to the plaintiffs, the defendants

---

[5] However, the claim is only valid to the extent that Mobil and Buchanan breached the Rent Guidelines in setting the proposed rent that would take effect from 2011 forward. GTO cannot retroactively challenge the rent that had been set by Mobil from 2006-2010 pursuant to the Lease. As the defendants correctly note, these challenges must be made within ten days of receiving the summaries of appraised values from Mobil, and nothing in the pleadings indicates that GTO challenged the rent that was set by Mobil in either 2006 or 2009 pursuant to the rent-setting procedures of the Rent Guidelines. Thus, GTO cannot claim a breach on those rent charges.

[6] This includes the one year suit limitation provision raised by the defendants. The court declines to address this issue at this time because it would not categorically bar the plaintiffs' claim; it would bar only claims involving the defendants' rent appraisals prior to May 10, 2010, as the defendants admit in their brief. (*See* Def. Rep. Br. at 5.) The plausible claim that survives in this count involves conduct that occurred after that date.

7

"unilaterally and unreasonably rais[ed] fuel prices charged to the Plaintiffs in bad faith calculated without reference to any good faith market rate formula or legitimate regional policy but instead to Buchanan's objective of terminating certain dealerships." (*Id.* ¶ 55.)

The plaintiffs allege that the defendants breached their obligations under the Illinois Commercial Code, which requires sellers who fix prices under a contract to fix those prices in "good faith." *See* 810 ILCS 5/2-305(2).[7] This court has discussed a similar "open price term" in another gasoline contract and has confirmed that it falls within the scope of § 2-305, triggering the lessor's obligation to "fix the price to Plaintiffs 'in good faith.'" *Dixie Gas & Food, Inc. v. Shell Oil Co.*, No. 03 C 8210, 2008 WL 631106, at *5 (N.D. Ill. Mar. 3, 2008). While courts in Illinois have not gone to great lengths to clarify the meaning of this "good faith" requirement, at least one court has suggested that bad faith can arise where a seller forces a buyer "to accept terms that had not been contemplated in the original contract and were not economically feasible for [the

---

7    The complete statute is quoted below:

Open price term. (1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

(a) nothing is said as to price; or
(b) the price is left to be agreed by the parties and they fail to agree; or
(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

810 ILCS 5/2-305.

buyers]." *Milex Prods., Inc. v. Alra Labs., Inc*, 603 N.E.2d 1226, 1235 (Ill. App. Ct. 1992).

Here, the court concludes that the plaintiffs' breach of contract claim under § 2-305 of the Illinois Commercial Code is not futile. The allegations are sufficiently detailed to place the defendants on notice that (1) there was an "open price term" in the contract; (2) there was a duty of good faith associated with that term; and (3) the defendants may have breached that duty of good faith by setting fuel prices in a manner that did not comport with industry or other norms that were contemplated by the parties at the time the contract was made. Indeed, the plaintiffs allege that their gas station was arbitrarily charged higher prices than other gas stations. (Proposed Am. Compl. ¶ 58.) Thus, notwithstanding the defendants' various objections,[8] this court should proceed.

### B. Conversion Claim (Count II)

Count II of the plaintiffs' complaint alleges conversion based on the defendants' alleged withholding of credit card receipts from the plaintiffs. In Illinois, the tort of conversion requires the plaintiffs to show that they (1) have "an absolute and unconditional right to the immediate possession of [] property" and that (2) "the defendant wrongfully and without authorization assumed control, dominion, or

---

[8] The court finds all of the defendants' objections to this count unpersuasive. First, even assuming that § 2-305 has a pre-suit notice requirement, the complaint sufficiently alleges pre-suit notice. (*See* Proposed Am. Compl. ¶ 58.) It would be premature to dismiss this count on that ground. Second, nothing about *Abbott v. Amoco Oil Co.*, 619 N.E.2d 789, 796 (Ill App. Ct. 1994), cited by the defendants, obviates the defendants' good faith obligation under § 2-305. In *Abbott*, the plaintiffs alleged bad faith based solely upon "an unexpectedly high price"; that case did not involve a situation where an open price term allegedly was applied differentially to various gas dealers. The defendants' third and fourth objections cite cases outside of this jurisdiction and simply repeat the common understanding that prices set in good faith should be nondiscriminatory and within reasonable ranges for the relevant market. The plaintiffs specifically allege that the prices "charged were different than other dealers and were outside of the range of dealer prices charged by other refiners in Plaintiff's relevant geographic market." (Proposed Am. Compl. ¶ 58.) Although these allegations could be more specific, they are sufficient at this stage of the litigation. The defendants' final objection merely reiterates the defendants' belief that the allegations are too vague, but the court disagrees.

9

ownership over the property." *Johnson v. Grossinger Motorcorp, Inc.*, 753 N.E.2d 431, 438 (Ill. App. Ct. 2001). These are the elements of the prima facie case for conversion, meaning that they go above and beyond the pleading requirements of Rule 8. Nonetheless, the plaintiffs' complaint pleads both of the elements of the conversion tort. Specifically, they allege that, after "Buchanan sent a termination notice to the Plaintiffs advising the Plaintiffs that the PMPA Lease Agreement was being terminated," (Proposed Am. Compl. ¶ 27), "Buchanan unilaterally converted all of the Plaintiffs' credit card receipts, to which Plaintiffs[] had an unconditional and absolute right to immediate possession . . . ." (*id.* ¶ 28.) These allegations are sufficiently specific to inform the defendants of what the claim entails.

The defendants argue that the Lease agreement "expressly authorized" Buchanan to retain credit card receipts and other sums as security to offset the plaintiffs' indebtedness, which would imply that the plaintiffs did not have an "unconditional and absolute right to immediate possession" of the credit card proceeds. If that were true, the plaintiffs' conversion claim would be futile as a matter of law.

Nonetheless, the court cannot conclude at this time that the defendants were entitled to the plaintiffs' credit card receipts. The Lease provisions that Buchanan argues allow it to engage in such withholding of credit card receipts and other sums do not necessarily apply here. Section 2.4 of the Lease allows the defendants to "maintain security sufficient to secure payment" ("Product Security"). However, the provision specifically states that the Product Security may be collected from the plaintiffs only "if requested," and nothing in the proposed amended complaint or attached documents indicates that Mobil or Buchanan made such a request to collect Product Security from

10

the plaintiffs. Section 2.5, meanwhile, allows the defendants to set aside Product Security, but this provision would be irrelevant if the defendants never requested to withhold such security in the first place.

Section 14.4 on the Lease, finally, would allow the defendants to "apply . . . sums or security" *other than* the Product Security to pay down the indebtedness of a party that had defaulted under the Lease, but whether or not a default occurred here (as default would be defined under the Lease) is a question that needs to be resolved at summary judgment or trial. Although the defendants argue that Section 14.4 is triggered by Buchanan's letter of September 1, 2011, which stated that the plaintiffs were "in default [or violation] of your PMPA Franchise Agreement" because GTO's gas station was out of special and super gasolines, it is not entirely clear that this would have triggered Section 14.4. Indeed, the nature of the September 1, 2011 letter suggests that it is a form letter that is used by Buchanan whenever a default *or violation* occurs with respect to one of its gas stations, and it is not clear whether the problems with the plaintiffs' gas station inventory would constitute a violation as opposed to a default under the Lease. These contractual interpretation issues necessitate further analysis and discovery and will be more appropriately addressed at a later stage of this litigation. Accordingly, the court cannot conclude that the plaintiffs' conversion claim is futile.

### C. Petroleum Management Practices Act (PMPA) Claims (Counts III & IV)

1. <u>Count III</u>

Count III of the plaintiffs' complaint alleges that Buchanan's September 1, 2011 notice "failed to comply with the advance notice requirement of the PMPA and failed to provide a basis to terminate recognized by the PMPA." (Proposed Am. Compl. ¶ 38.)

11

They further allege that the September 1, 2011 notice "terminat[ed] the Plaintiff's franchise," (*id.*), which would trigger the notification requirements of the PMPA. *See* 15 U.S.C. § 2802(b)(1)(A); 15 U.S.C. § 2804(a).

However, an examination of the September 1, 2011 letter indicates that it was not a notice stating an intent to terminate the plaintiffs' franchise. While, as noted above, it indicated that the plaintiffs had either defaulted on or had violated their obligation to maintain certain levels of inventory, and it stated that a consequence of failure to correct the violation could result in termination of the PMPA franchise agreement, the September 1, 2011 notice was not actionable under the PMPA because it did not indicate that the Lease would be terminated or non-renewed. *See, e.g.*, *Garcia v. BP Prods. N. Am., Inc.*, No. 09-2675, 341 F. App'x 217, 219 (7th Cir. Aug. 13, 2009) (affirming a district court's determination that a letter cannot be construed a termination or nonrenewal where that letter "d[oes] not specifically say that it was a termination or nonrenewal"). Meanwhile, "it is the franchisee's initial burden under the PMPA to establish that its franchise has been terminated or not renewed." *Garcia*, 341 Fed. App'x at 219 (citing 15 U.S.C. § 2805(c); *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1216 (7th Cir. 1982)). Thus, at least with respect to Count III, the plaintiffs will not be able to show that, as of September 1, 2011, their lease had been terminated or non-renewed. And when the defendants subsequently sent the plaintiffs a notice of termination on November 2, 2011, that notice complied with all of the notification requirements of the PMPA: it was in writing, was sent certified mail, and contained a statement indicating an intention to terminate the franchise along with the date on which that nonrenewal takes effect. *See* 15 U.S.C. §

2804(c); (Proposed Am. Compl. Ex. 8.) Thus, the court concludes that Count III is futile; the plaintiffs may not include this count in their amended complaint.[9]

    2. Count IV

Count IV alleges that Buchanan violated the PMPA by terminating the plaintiffs' franchise without just cause. Preventing such arbitrary terminations of gasoline franchisees is one of the central goals of the PMPA. Indeed, "Congress enacted the PMPA in an effort to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Garcia*, 341 Fed. App'x at 218 (quoting S. Rep. No. 95-731, at 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 874).

This count is not futile. It specifically alleges that the first reason proffered for Buchanan's termination of the plaintiffs' franchise—that the plaintiffs failed to pay rent—was invalid because "[t]he Plaintiff was ready, willing and able to pay the rent but Buchanan failed to EFT the rent in order to set up a false reason for terminating the Plaintiff's franchise." (Proposed Am. Compl. ¶ 41.) Thus, even though failing to pay rent would be a valid reason to terminate the franchise under 15 U.S.C. § 2802(b)(2)(C) of the PMPA, the stated reason may not have been made in good faith. *See, e.g.*, *Beck Oil Co., Inc. v. Texaco Refining & Mktg, Inc.*, 25 F.3d 559, 562 (7th Cir. 1994) (noting in an analogous context that meeting a burden of good faith under the PMPA requires that a franchisor not have a discriminatory motive and that the reasons for its decisions "are not a pretext disguising an improper purpose").

Although the plaintiffs do not make allegations challenging Buchanan's second stated reason for termination—that the plaintiffs failed to sign the defendants' new lease

---

[9] The court further notes that the plaintiffs did not raise any arguments in support of Count III in their opposition brief to the defendants' motion to dismiss.

agreement presented to them in April 2011—this stated reason may also be invalid under the PMPA. Section 2802(b)(3)(A) of the PMPA allows a franchisor to decline to renew a franchise relationship where the franchisor and franchisee "fail to agree to changes or additions to the provisions of the franchise." However, such failures to agree to new terms warrant non-renewal only if the franchisor's proposed changes are (1) "made by the franchisor in good faith and in the normal course of business"; and (2) are "not the result of the franchisor's insistence upon such changes or additions for the purpose of . . . preventing the renewal of the franchise relationship." *See* 15 U.S.C. § 2802(b)(3)(A)(i)-(ii). Thus, if the terms of the proposed 2011 lease were not made in good faith—for example, if Buchanan's rent appraisal for that lease was made in bad faith—the plaintiffs' refusal to sign that lease cannot be a valid ground for termination. Moreover, if the plaintiffs are able to show that the April 2011 proposal was created with the goal of preventing the plaintiffs from renewing their lease, that would furnish another reason to make the defendants' second stated ground for termination invalid. Because the complaint makes allegations that make such inferences plausible, the court cannot conclude that the plaintiffs' PMPA claim in Count IV is futile. The plaintiffs could plausibly show that Buchanan did not justify its proposed termination of the plaintiffs' franchise for a valid reason under the PMPA. Accordingly, Count IV is not dismissed and may proceed.

### D. Equitable Recoupment (Count V)

The court agrees with the defendants, however, that the plaintiffs' equitable recoupment claim is futile. As Judge Coar properly noted in *Singh v. BP Products North America, Inc.*, No. 04 C 2088, 2006 WL 273542, at *7 (N.D. Ill. Jan. 31, 2006),

14

"equitable recoupment is a counterclaim brought to diminish or defeat a party's (generally, plaintiff's) recovery." Here, although the plaintiffs contend that the claim is "made in response to Buchanan's termination of the Plaintiff's franchise and [is] made in the nature of the counterclaim," (Proposed Am. Compl. ¶ 12), that does not make it a counterclaim. The very case the plaintiffs cite to show that their equitable recoupment claim is justified, *Cox v. Doctor's Associates, Inc.*, 613 N.E.2d 1306 (Ill. App. Ct. 1993), actually undermines the plaintiffs' position.[10] In *Cox*, the plaintiffs—franchisees of Subway—were able to assert equitable recoupment as a counterclaim against counter-defendants who had filed their own counterclaim seeking damages for the plaintiffs' continued use of the Subway trademark without authorization. *See id.* at 1314-15. The plaintiffs sought to justify their continued use of the mark through the doctrine of equitable recoupment, which would have enabled them to reduce any damages Subway received on its trademark counterclaim. Specifically, the theory was that Subway was not entitled to all of its damages on the trademark infringement counterclaim, given that the plaintiff had not fully recovered—or recouped—its investment in the franchise.

However, the situation here is not analogous to *Cox*. The plaintiffs are not engaging in wrongful conduct (for example, continuing to operate their Mobil-branded gas station without authorization) to recoup losses. Specifically, the plaintiffs are not seeking to reduce any damages that, as a result of their own conduct, they may have imposed on the defendants. Rather, they are seeking damages against the defendants for the defendants' allegedly wrongful conduct. Thus, equitable recoupment is inapplicable here, and all of the damages sought by plaintiffs against the defendants in the remaining

---

[10] Indeed, Judge Coar specifically cited *Cox* for the proposition that equitable recoupment must be a counterclaim in Illinois. *See Singh*, 2006 WL 273542, at *7. As the analysis below indicates, the court agrees with that reading of Cox.

counts will sufficiently compensate them for any losses they may have suffered. The plaintiffs' equitable recoupment theory is flawed, and this claim is dismissed as a result of its futility.

### E. Oshana's Standing

Finally, the defendants argue that plaintiff Oshana should be dismissed as a plaintiff from this suit, which would leave GTO as the sole plaintiff in this case. The court agrees. The discussion above indicates that all of the plaintiffs' claims, even the PMPA and conversion claims, in some way bear a connection to various provisions of the Lease. Meanwhile, the Lease specifically states that "no person or entity not a party to this Agreement has any rights or remedies under this agreement." (Lease § 20.10.) The Lease defines "party" as Mobil and its assigns (in this case, Buchanan) and the Franchise Dealer as defined in the agreement. (*Id.* at 46.) The Franchise Dealer, as defined in the Lease's preamble, (*see id.* at 45) solely refers to GTO Investments, (*see id.* at 5) and not to George Oshana in his individual capacity. While a Franchise Dealer can be an individual in some instances,[11] Oshana chose to make GTO Investments the legal franchisee. Accordingly, Oshana is only a personal representative of the Franchise Dealer, GTO Investments, and he does not have any legal rights under the Lease.[12] This was what Oshana agreed to when he assigned the defendants' Key Individual Guaranty agreement, which further underscores the fact that becoming the Key Individual in no

---

[11] The Lease specifically contemplates a single Franchise Dealer in the event that the dealer is an individual. If, however, the Franchise Dealer is a corporate entity, Mobil designates a Key Individual to serve as a personal representative for the Franchise Dealer. This Key Individual is designated through a "Key Individual Guaranty" agreement, which George Oshana signed.

[12] Although the court acknowledges that Oshana is the Key Individual for the purposes of the Lease, nothing in the Lease suggests that the Key Individual is a party to the Lease agreement. Only parties to the Lease agreement have rights under it.

way gave Oshana any rights as a Franchise Dealer or "any rights in or under the [Lease], any related or supplemental agreement or any related franchise or franchise relationship." (*See* Key Individual Guaranty § 5.E(i)-(ii).) Thus, Oshana does not have standing to sue for injuries inflicted on the Franchise Dealer—GTO Investments—that arise from breaches of the Lease. Moreover, Oshana is not a franchisee for the purposes of the PMPA, so he has no remedies under the PMPA.[13]

Beyond the fact that the Lease counsels dismissing Oshana, he must also be dismissed as a party because he serves as a guarantor to his own corporation. When guarantors (like Oshana) provide performance assurances to businesses in exchange for the right to create a corporate franchisee (like GTO), they disclaim their rights to sue in their individual capacity because they are not directly injured by the defendants' conduct, insofar as that conduct inflicts harm only on the corporation; as a result, they may sue only if they are injured independently from the firm's injury. *See, e.g.*, *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1335–36 (7th Cir.1989) (noting that "creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover"). Oshana cannot make any damage claims that are independent from the damages inflicted on GTO as the Franchise Dealer, and accordingly he must be dismissed from this suit in his individual capacity.

## IV. CONCLUSION

For the reasons stated above, the plaintiffs' motion for leave to file an amended complaint is granted, insofar as the amended complaint complies with the dictates of this

---

[13] Only a franchisee may sue under the PMPA, *see* 15 U.S.C. § 2805(a), and a franchisee is defined as a "retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." *Id.* § 2801(4). Oshana is not authorized, in his individual capacity, to use Mobil's trademark. (*See* Lease § 7.1 (noting that only the "Franchise Dealer"—in this case GTO—has rights in the use of proprietary marks under the Lease)).

17

order. The defendants' motion to dismiss is granted as to Counts III and V, but is denied as to Counts I, II, IV, and VI, which should be included in the plaintiffs' amended complaint. Oshana, in his individual capacity, is dismissed as a party to this suit. The plaintiffs have 30 days from the entry of this order to file their amended complaint.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 10, 2012