UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| GTO INVESTMENTS, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11 C 4135 |
| v. | ) ) | Judge Joan B. Gottschall |
| BUCHANAN ENERGY and EXXONMOBIL OIL CORPORATION, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff GTO Investments, Inc. ("GTO") moves for a preliminary injunction under the relevant provisions of the Petroleum Management Practices Act (the "PMPA"), 15 U.S.C. § 2801 *et seq.* For the reasons stated below, the court grants preliminary injunctive relief to GTO.

### I. BACKGROUND

GTO operates a Mobil-branded gas station in Itasca, Illinois. In 2006, GTO entered into a franchise agreement with Mobil (the "Lease"), which Mobil assigned to Buchanan when Buchanan acquired various gas station properties from Mobil in December 2010. Because the Lease was set to expire on March 31, 2011, Buchanan, in April 2011, sent GTO a new dealer lease and supply agreement (the "Proposed Lease") that would become effective April 1, 2011 and terminate on March 21, 2014. GTO refused to sign the Proposed Lease because it objected to various terms pertaining to rent, gasoline pricing, and other aspects of the franchisor-franchisee relationship. As a result, GTO continues to operate the gas station under the original Lease.

On November 2, 2011, Buchanan provided GTO with notice that its franchise would be non-renewed effective February 7, 2012 based on GTO's failure to sign the Proposed Lease.[1] On January 27, 2012, Buchanan wrote GTO reminding it that the nonrenewal would take effect on February 7, 2012, and that GTO needed to vacate the premises by that date. Shortly thereafter, on February 3, 2012, GTO filed a motion for a temporary restraining order ("TRO") and a preliminary injunction under the PMPA. The TRO was granted on February 7, 2012 and this court extended the TRO pending this ruling on GTO's preliminary injunction motion.

## II. LEGAL STANDARD

Under the PMPA, "the court shall grant an injunction" where a franchisee demonstrates that (i) the franchise "has not been renewed"; (ii) "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation"; and (iii) "the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(2). Upon "receiv[ing] notice of nonrenewal, [the franchisee] can seek a preliminary injunction under [this] relaxed injunctive standard, maintaining the status quo while a court determines the lawfulness of the proposed changes" to an agreement. *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 130 S.Ct. 1251, 1263 (citing 15 U.S.C. § 2805(b)(2)).

---

[1] Buchanan also indicated in its November 2, 2011 notice of nonrenewal that GTO would be non-renewed because GTO failed to pay rent. But Buchanan "informed GTO that it would not rely on GTO's failure to make a timely rent payment as grounds for nonrenewal." (Def.'s Opp'n Mem. at 10 n.4, ECF No. 37.) In addition, GTO contends that it paid this rent. Thus, the court does not address this ground for nonrenewal in its opinion.

### III. ANALYSIS

In this case, there is no dispute that GTO has received notice of nonrenewal. The court, therefore, is left with two questions. First, the court must ask are whether GTO has raised "sufficiently serious questions going to the merits to make such questions a fair ground for litigation," 15 U.S.C. § 2805(b)(2). To prevail on this issue, GTO "need only prove 'a reasonable chance of success on the merits' of its claim of a PMPA violation . . . .'" *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 905 (7th Cir. 1997) (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir. 1984)). Second, the court must assess whether "the balance of hardships tips in [GTO's] favor." *Beachler*, 112 F.3d at 905. As discussed below, GTO prevails on each of these questions.

### A. Whether GTO Has a "Reasonable Chance of Success on the Merits"

Buchanan chose not to renew GTO because GTO refused to sign the Proposed Lease. This refusal could provide a legitimate ground for nonrenewal under the PMPA. *See* 15 U.S.C. § 2802(b)(3)(A). Nevertheless, GTO can establish a PMPA violation if it demonstrates (i) that the terms imposed on GTO by the Proposed Lease were not "made by [Buchanan] in good faith and in the normal course of business," *id.* § 2802(b)(3)(A)(i); or (ii) that Buchanan's new terms were a pretext for nonrenewal. *See id.* § 2802(b)(3)(A)(ii); *Lippo v. Mobil Oil Corp.*, 802 F.2d 975, 977 (7th Cir. 1986) (noting that the PMPA requires that proposed changes be "made in good faith, in the normal course of business, and not as a pretext for nonrenewal").

1. <u>Evidence Suggesting Buchanan's Bad Faith in Proposing its New Terms</u>

GTO argues that Buchanan imposed the Proposed Lease terms in bad faith. In its brief, GTO claims that "[t]he unreasonable, arbitrary and unconscionable changes in the

3

[Proposed Lease] being imposed upon GTO by Buchanan are not in good faith or in the normal course of business, but rather for the purpose of preventing renewal and/or allowing Buchanan the ability to more easily convert the leased marketing premises to company owned or operated stations at Buchanan's discretion." (Pl.'s Mem. in Supp. at 10, ECF No. 35.) There are several terms that GTO argues were proposed by Buchanan in bad faith. For example, the Proposed Lease contains unspecified rent amounts for years two and three of the lease, does not have provisions allowing dealers to challenge proposed rent amounts and, in GTO's view, imposes anticompetitive fuel pricing policies.[2] Of course, general allegations, standing alone, do not enable this court to grant a preliminary injunction. GTO must provide evidence showing that it has a reasonable chance of succeeding on its claim. *See Beachler*, 112 F.3d at 905. The relevant evidence provided by GTO is discussed below.

*Unspecified Rent Amounts Under the Proposed Lease*

The Proposed Lease, which did not set rent amounts for the second and third years of the lease, was offered to GTO on a take it or leave it basis. As the court noted in its February 16, 2012 order, "Oshana has averred that Kevin Kendrick of Buchanan told him that [the unspecified rent amounts] 'could be $20,000 or $30,000 or $40,000, it is up to us. Take it or leave it.'" (*See* Order at 2, ECF No. 55 (quoting Oshana Aff. ¶ 23).) The court agrees with Buchanan that a "take it or leave it" offer, if made in good faith, would not justify relief for GTO. *See Santiago-Sepulveda v. Esso Standard Oil Co.*, 638 F. Supp. 2d 193, 199 (D.P.R. 2009) (noting that offering an agreement on a "take it or leave

---

[2] GTO also expresses concern about other provisions in the Proposed Lease regarding the sale of convenience store products and the property maintenance responsibilities of franchisees. (*See* Pl.'s Mem. in Supp. at 11-12.) However, the court is unconvinced that GTO has furnished sufficient evidence at this time indicating that these Proposed Lease terms were designed in bad faith.

4

it" basis can be a business decision that is "devoid of bad faith"). However, if an agreement is presented in this manner, and that agreement contains coercive terms, relief would be justified. *See Jet, Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002 WL 31641627, at *4 (N.D. Ill. Nov. 22, 2002) (suggesting that the PMPA "provide[s] . . . relief for franchisees presented with *coercive renewal agreements* on a take-it-or-leave-it basis" (emphasis added)). Here, Kendrick's "take it or leave it" statement is illustrative of the coercive character of the Proposed Lease. Specifically, Section 3(b) of the Proposed Lease could allow Buchanan to charge unconscionably high rents at six months notice. (*See* Ex. 10 to Pl.'s Mem. in Supp.) Nothing in the Proposed Lease indicates that there are any meaningful limitations on proposed rent charges for years 2 and 3.[3]

GTO, meanwhile, adduces other evidence suggesting bad faith with regard to the unspecified rent amounts. Oshana avers that the failure to specify rent amounts causes the "value of [his] franchise . . . [to] become worthless," and that prospective buyers of his station "will not make an offer to purchase [his] business until the rent for years 2 and 3 is inserted in the Buchanan lease." (Oshana Second Supp. Aff. ¶ 2, ECF No. 59.) In addition, several other dealers aver that a lease's failure to specify rents for years 2 and 3 significantly diminishes the value of their businesses:

> Unlike ExxonMobil's franchise agreement where the annual rent is established and documented throughout the duration of the three-year lease, Buchanan's Proposed Lease only states the first year [sic] rent. The second and third year [sic] rents are left blank. There is no "cap" as to how much Buchanan could increase the rent in subsequent years and Buchanan can change the rent at any time on 6 months [sic] notice. According to Buchanan [sic] lease, the dealers have no legal

---

[3] Section 3(b) reads, "Lessor reserves the right to adjust the agreed monthly rent specified in [the Proposed Lease]. Any such adjustment (whether an increase or decreas to said agreed monthly rental) will be determined according to the policy in the relevant market in effect at the time of the adjustment. Lessor will provide the Dealer with six (6) months prior written notice of the adjustment." (Ex. 10 to Pl.'s Mem. in Supp.) There may be a "policy" that places limitations on the extent to which Buchanan may increase the rent, but Buchanan has not directed this court to any such policy.

recourse to challenge the landlord if he fills in 10% or 15% annual rent increases in the blank lines. We view this as if we sign blank checks. (Solia Aff. ¶ 8; *see also* Nashed Aff. ¶ 8; Sul Aff. ¶ 8; Youssef Aff. ¶ 8 (containing the same paragraph or slight variants thereof).)

While the court agrees with Buchanan that it is not true that franchisees "have no legal recourse" in the event Buchanan begins imposing unreasonably high rents, that does not mean that a contract which leaves the rent term open is presented in "good faith in the ordinary course of business." The court acknowledges that Buchanan may decide to set its franchisees' rents for years two and three in good faith, but Buchanan misses the point: it is the fact that the rents are unspecified for years two and three that creates crippling uncertainty now and discourages prospective buyers who might otherwise wish to buy GTO's station.

Several other dealers, like Oshana, aver that they will not sign the Proposed Lease because they believe that the new lease terms are "not made in good faith by Buchanan," are "one-sided in favor of Buchanan," and "will lead to the demise" of their businesses. (*See* Solia Aff. ¶¶ 4, 14; Sul Aff. ¶¶ 4, 14; Farag Aff. ¶ 4 & p. 5; Youssef Aff. ¶¶ 4, 14.) These affidavits suggest that Oshana is not an outlier in asserting that Buchanan is engaging in subjective bad faith; further, the affidavits suggest that Buchanan's Proposed Lease terms, while uniform, may have the effect of squeezing out several of Buchanan's franchisees from the market.

*Discriminatory Gasoline Pricing Under the Proposed Lease*

Moreover, the gasoline pricing under the Proposed Lease could have crippling effects on GTO. The evidence indicates that Buchanan is pricing GTO's gasoline in a discriminatory manner. Specifically, Oshana avers that Buchanan often charges him, as a *dealer*, more for gas than it charges its own *customers* for gas at its company-operated

6

station located less than one-quarter of a mile from GTO's station. (*See* Supp. Affidavit of George Oshana ¶ 8 (averring that on February 18, 2012 GTO's cost for fuel was $3.49 and that Buchanan was selling its fuel to customers at its station one-quarter mile away for $3.39); *id.* ¶ 9 (averring that, on February 19, 2012, GTO's cost was $3.49 and Buchanan's customers' cost was $3.40); *see also id.* ¶ 10 (averring that, on February 20, 2012, GTO's cost was $3.49 and Buchanan's customers' cost was $3.50).). It is unlikely that GTO could effectively compete with Buchanan's station if GTO's gas is priced in this manner. And nothing in the record indicates that Buchanan would be pricing its gas in a more reasonable manner if GTO had signed the Proposed Lease.

Indeed, GTO has submitted an affidavit from a dealer named Talaat Nashed, who has already signed Buchanan's Proposed Lease and is currently governed by that lease. (*See* Nashed Aff. ¶ 4.) Nashed avers that:

> Unlike ExxonMobil zone pricing, where the fuel pricing was based on the competing gas stations in the immediate surrounding geographic area, Buchanan [sic] lease does not provide competitive prices to allow us to fairly compete. In fact, in many instances, the Buchanan owned stations located at 1500 W. Schaumburg Rd – less than two miles from my station – sells fuel to its retail customers at prices *below my cost*. Buchanan's pricing strategy resulted in losing roughly 35% of my business since Buchanan acquired ExxonMobil's assets. (*Id.* ¶ 11 (emphasis added).)

Nashed's affidavit demonstrates that Buchanan applies the gas pricing terms of the Proposed Lease in a manner which allows it to place independent dealers at a significant competitive disadvantage relative to Buchanan's company-owned stations. This corroborates GTO's position that Buchanan is forcing it out of business by imposing the terms of the Proposed Lease.

7

2. <u>Buchanan's Responses to GTO</u>

Despite the above evidence, Buchanan contends that GTO does not have a reasonable PMPA claim. It argues that (i) many of GTO's concerns under the Proposed Lease should be asserted as contract claims and are irrelevant to the court's analysis of Buchanan's subjective bad faith; and (ii) Buchanan's Proposed Lease terms were uniformly presented to all of its dealers, and those terms were generated in good faith and in the ordinary course of business.

As for Buchanan's first argument, the court agrees that many of GTO's concerns, assuming it signed the Proposed Lease (which it has not), could be asserted under Illinois contract law. But that does not foreclose GTO's PMPA claim. In *Mac's Shell*, the Supreme Court was concerned about franchisees that signed renewal agreements and then claimed that objectionable contract terms amounted to constructive termination. It noted that "[r]eading the Act to prohibit simple breaches of contract . . . would be inconsistent with the Act's limited purpose and would further expand federal law into a domain traditionally reserved for the States." 130 S.Ct. at 1259. But the Court understood that inquiries into the reasonableness of contractual provisions would sometimes be necessary under the PMPA. As the Court stated, "Under the balance struck by the plain text of the [PMPA], a franchisee faced with objectionable new terms must decide whether challenging those terms is worth risking the nonrenewal of the franchise relationship; if the franchisee rejects the terms and the franchisor seeks nonrenewal, the franchisee runs the risk that a court will ultimately determine that the proposed terms were lawful under the PMPA." *Id.* at 1264 (citing 15 U.S.C. § 2802(b)(3)(A)). Here, GTO has chosen to take that risk, believing that Buchanan has "impos[ed] [] arbitrary and unreasonable new

8

terms . . . that are designed to force an end to the petroleum franchise relationship." *Id.* As discussed above, some of these terms may give rise to a viable PMPA claim. If GTO loses its PMPA claim, however, it will also lose its franchise.

With respect to Buchanan's second argument, the court acknowledges that the Proposed Lease contains the same terms that Buchanan provides to its other franchisees. The evenhanded treatment of dealers sometimes evinces good faith.[4] *See, e.g.*, *Lippo*, 802 F.2d at 981 (upholding summary judgment against franchisee where the franchisee was unable to "show that he was treated differently from other dealers"); *Toor Petroleum, Inc. v. Marathon Petroleum Co. LP*, No. 11 C 461, 2011 WL 4352614, at *4 (S.D. Ohio Sept. 16, 2011) (denying a preliminary injunction where the plaintiff had been offered "the same terms consistently extended by Marathon in the normal course of business"); *Grotemeyer v. Lake Shore Petro Corp.*, 749 F. Supp. 883, 891 (N.D. Ill. 1990) (noting that offering similar contract terms to third parties "is strong evidence that . . . proposed changes . . . were nondiscriminatory," and that the terms were therefore not designed as a pretext for nonrenewal). However, in citing *Lippo*, *Toor*, and *Grotemeyer*, Buchanan misapprehends the nature of GTO's claim. GTO does not contend that Buchanan is treating GTO worse than other franchisee dealers; it contends that Buchanan is treating it worse than Buchanan's company-owned stations, which are not subject to the Proposed Lease.

GTO directs the court to *Tiller v. Amerada Hess Corp.*, 540 F. Supp. 160 (D.S.C. 1981), which provides an apt analogy to this case. In *Tiller*, several dealers sought a preliminary injunction where Hess—the defendant—had, under a new lease agreement,

---

[4] The only exception to this is the rent amount that Buchanan charges to dealers in the first year under the Proposed Lease, which may vary from dealer to dealer.

imposed rent increases on those dealers using a uniform rent formula and other terms that the plaintiffs asserted "were not [imposed] in good faith and in the ordinary course of business." *Id.* at 162. Despite the uniform terms offered by Hess, the court granted a preliminary injunction.

The court noted in *Tiller* that "[w]hile the uniform application of a rent increase is evidence of good faith on the part of the franchisor, it is in and of itself not conclusive on the issue of good faith under the [PMPA]." *Id.* at 164. This is because "subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence," and "bad faith may be inferred from the circumstances involved in the particular case." *Id.*; *see also Beck Oil Co., Inc. v. Texaco Ref. & Mktg., Inc.*, 25 F.3d 559, 562 (7th Cir. 1994) (noting that, under the PMPA, "th[e] test for good faith is one of subjective intent"). In *Tiller*, the court concluded that, notwithstanding the uniformity of proposed new lease provisions, from "the manner in which the new rent structure was formulated, . . . the policy decisions of Hess concerning the phasing out of dealer operated stations, and . . . the manner in which the Proposed Lease agreement was promulgated, it can be reasonably inferred that the new rental structure in the Proposed Lease agreement was a mere subterfuge and that Hess acted in bad faith in attempting to force the dealer-operator/Plaintiffs out of business contrary to the intent and purpose of the [PMPA]." *Id.* In this case, the circumstantial evidence similarly suggests serious questions of whether or not Buchanan harbors a purpose and intent to force its dealer-operated stations out of business at the expense of its company-operated stations, and whether it is using the Proposed Lease to achieve that end.

For the reasons stated above, GTO has a reasonable chance of demonstrating that Buchanan insisted on burdensome and unfair changes or additions to the Lease for the purpose of preventing the renewal of the franchise relationship. *See* 15 U.S.C. § 2802(b)(3)(A); *see also Beck Oil*, 25 F.3d at 562 (noting that a good faith showing under the PMPA requires that a reason for nonrenewal of a franchise cannot be "a pretext disguising an improper purpose").

**b. Whether the Balance of the Equities Favors GTO**

The balance of the equities favors GTO. As noted in this court's previous order, GTO invested over $325,000 in its gas station and will permanently lose its franchise if the court does not enjoin Buchanan's non-renewal. GTO, meanwhile, has posted a security deposit of $25,000 with Buchanan and a $25,000 bond with this court that will secure Buchanan's potential losses. Moreover, GTO continues to pay Buchanan more monthly rent ($10,803) than it would currently be paying Buchanan if it had signed the Proposed Lease ($7,768). Buchanan, finally, has not demonstrated that it would be prejudiced by an injunction allowing GTO to continue operating its station during the pendency of this litigation.

## IV. CONCLUSION

Because GTO has produced enough evidence to suggest that it has a reasonable chance of prevailing on the merits of its PMPA claim, and because the balance of the equities favors GTO, GTO's motion for a preliminary injunction is granted. The bond previously set will stand.

ENTER:

                    /s/
           JOAN B. GOTTSCHALL
           United States District Judge

DATED:   March 5, 2012

                    /s/
           JOAN B. GOTTSCHALL
           United States District Judge

DATED:   March 5, 2012